**David Maloof**

---

| | |
|---|---|
| **From:** | Ian McLelland [IMcLelland@collyers.com] |
| **Sent:** | Friday, November 18, 2011 6:31 AM |
| **To:** | David Maloof |
| **Cc:** | Charles Simmons; David.Oldham@cevalogistics.com; Katherine Gingise; Maria R.(IAH-Corp) Guerrero; kevans@vericlaiminc.com |
| **Subject:** | Toshiba - 20 Apr 11 - FM0007110895 - CM1242910 - 1415.86 CEVA III |
| **Attachments:** | Toshiba - 20 Apr 11 - FM0007110895 - CM1242910 - LAX11409862 |

With reference to your letter dated 16 November to CEVA we attach our recent e-mail to Vericlaim and in response to their claim on behalf of subrogated cargo insurers.

With whom should we be dealing?


Ian Mclelland
Collyers

1

# EXHIBIT 5

**David Maloof**

| | |
|---|---|
| From: | Ian McLelland [IMcLelland@collyers.com] |
| Sent: | Friday, November 18, 2011 4:07 AM |
| To: | kevans@vericlaiminc.com |
| Cc: | Charles Simmons; David.Oldham@cevalogistics.com; Katherine Gingise; Maria R.(IAH-Corp) Guerrero |
| Subject: | Toshiba - 20 Apr 11 - FM0007110895 - CM1242910 - LAX11409862 |
| Attachments: | Toshiba Contract.TIF |

Please note we have also been passed your claim under reference LAX11409852.


Ian Mclelland

CEVA have forwarded to us your letter of claim dated 14 October and enclosures and we shall be grateful if you will note their interest on behalf of their goods in transit legal liability insurers.

Our investigations continue and we shall revert as soon as possible but in the meantime we refer to the liability provisions of the attached CEVA/Toshiba contract.


Ian Mclelland
Collyers
East Grinstead
England

1

FILE COPY

## TRANSPORTATION AGREEMENT

THIS AGREEMENT is made on June 1, 2003 ("Effective Date"), by and between Toshiba America Information Systems, Inc., a California corporation, with its principal place of business located at 9740 Irvine Boulevard, Irvine, California 92618 ("TAIS"), and EGL Eagle Global Logistics, LP, a limited partnership, with its principal place of business located at 15350 Vickery Drive, Houston, Texas 77032 ("Carrier").

### RECITALS

WHEREAS, TAIS wishes to tender cargo to Carrier, at various times, for Carrier to transport to certain locations pursuant to the terms of this Agreement; and

WHEREAS, TAIS desires to enter into this Agreement to fulfill its specific needs as stated herein including, but not limited to, those set forth in Section Nos. 4 and 6 herein below; and

WHEREAS, Carrier wishes to perform the transportation services as set forth in this Agreement including, but not limited to, the transport by air or motor vehicle, safely, with reasonable dispatch and without delay, as and when requested by TAIS, all cargo tendered to it by TAIS or its agent, and upon the following terms and conditions, as may be revised from time to time and agreed to by TAIS and Carrier.

### AGREEMENT

NOW THEREFORE, in consideration of the mutual promises, covenants and recitals contained in this Agreement, the Parties agree as follows:

1. <u>Term</u>. The term of this Agreement shall commence on the Effective Date set forth above, and shall continue for a period of one (1) year (the "Initial Term"). Thereafter, the Agreement shall automatically renew for succeeding terms of one (1) year each, unless terminated earlier in accordance with the provisions herein. Nothing in this Agreement shall be interpreted as requiring either party to renew or extend this Agreement.

2. <u>Termination</u>.

    2.1 Either party may terminate this Agreement without cause at any time upon thirty (30) calendar days prior written notice of termination in accordance with the notice provisions of Section 14.

    2.2 If an Event of Default (as hereinafter defined) by either party shall occur, the other party may give to such defaulting party written notice of such default, and if such defaulting party does not adequately cure such default within thirty (30) days after the date of said notice, this Agreement may be terminated at the option of the non-defaulting party by written notice to the defaulting party.

CONFIDENTIAL

2.3     Each of the following constitutes an Event of Default under this Agreement: (a) if a party attempts to assign its rights or delegate its obligations hereunder without obtaining the other party's consent; (b) if a party disposes of its property for the benefit of creditors; (c) if a party is voluntarily or involuntarily declared to be bankrupt; (d) if a party becomes insolvent; or (e) if a party breaches any of its material obligations under this Agreement.

2.4     Upon the termination of this Agreement for any reason, each party shall be released from all obligations and liabilities to the other occurring or arising *after* the date of termination, except the obligations for payment and indemnification specifically set forth in this Agreement. The expiration or termination of this Agreement shall not relieve Carrier or TAIS from any liability arising from any breach of this Agreement. Carrier agrees to maintain this Agreement in its files and to supply it to TAIS or its assigned representative, upon request, for a period of three (3) years after the termination, along with any and all documents concerning or related to TAIS' cargo.

3.      Rates and Charges. TAIS shall pay Carrier for the services provided pursuant to this Agreement at the rates set forth in Appendix A, attached hereto and made a part hereof. TAIS shall make all payments due hereunder within thirty (30) days of receipt of Carrier's invoice, provided that failure to do so shall not result in loss of TAIS' discount. If TAIS establishes a payment history averaging 15 days or less from date of invoice receipt for a consecutive 60 day period rates will be decreased by $.01/pound (domestic) and/or $.02/Kilogram (International). Payment for each International and Domestic business segment, as identified in the attached appendices, will be calculated separately. In the event that the TAIS average payment history rises above 15 days for 60 consecutive days the rates will return to those contracted for in Appendix A. Any discrepancy in the application of rates and charges under the terms of this Agreement must be addressed in a claim filed by either party within one (1) year of the date of invoice. Rates shown in Appendix A will applicable to all shipments including, but not limited to, collect, prepaid and third party shipments. Carrier shall charge TAIS only for the services actually rendered regardless of the services TAIS requested on the information set forth on any Bill of Lading. Upon TAIS' request for a refund and/or rate reduction related to a Carrier-caused service delay, Carrier shall immediately make such refund and/or reduction.

4.      No Rate Increases. TAIS has a need to stabilize rates for each term of this Agreement. During the Initial Term of this Agreement, Carrier shall not make any rate increases over those in effect and set forth on Appendix A as of the Effective Date of this Agreement, and Carrier waives its rights, if any, to charge any and all rate increases otherwise permissible. In the event Carrier incurs fuel charges or other unforeseeable cost increases above and beyond the scope of normal operating expenses, Carrier must discuss and reach an agreement with TAIS, on a case-by-case basis, on any price variances before Carrier may charge TAIS any rate above and beyond that set forth on Appendix A.

5. <u>Additional Charges</u>. Accessorial services performed by Carrier in connection with the services provided pursuant to this Agreement are included in the negotiated rates set forth on Appendix A. CARRIER SHALL NOT BE ENTITLED TO ANY FEES, COSTS OR PAYMENTS UNDER THIS AGREEMENT OTHER THAN THE COMPENSATION PAYABLE UNDER SECTION 3 OF THIS AGREEMENT. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, UNDER NO CIRCUMSTANCES SHALL CARRIER BE ENTITLED TO RECEIVE ANY OTHER PAYMENTS OR BENEFITS WHATSOEVER WHETHER BASED ON TERMINATION INDEMNITIES, LOST PROFITS, LOSS OF GOODWILL, CONSEQUENTIAL DAMAGES, OR OTHERWISE. TAIS must approve in writing any additional charges on a case-by-case basis prior to Carrier rendering the services related to such additional charges.

6. <u>Scope of Service</u>. Carrier shall provide quality transportation services from TAIS' distribution centers, as more specifically named in Appendix A or reissues thereof, as requested by TAIS to points served by the Carrier or its assignees. At no time does Carrier take ownership of any cargo TAIS or its designee tenders to Carrier for transportation. Ownership will remain with TAIS at all times with the Carrier being responsible for the safe and timely movement to the contracted destination. Carrier, on behalf of its agents, employees, officers or creditors, acknowledges that it has no right to place a lien or willingly hold the cargo TAIS or its designee tenders to it by TAIS. If Carrier or its agents or independent contractors deviate from shipping cargo to a contracted destination without TAIS' prior authorization, such conduct shall be considered a breach of this Agreement and a service failure. Additional services may, from time to time, be instituted upon a written amendment of this Agreement in the manner designated herein. As a material part of Carrier's service, Carrier shall comply with and shall not deviate from the Minimum Security Guidelines annexed hereto as Appendix B. Carrier shall submit to TAIS its public quarterly financial reports.

7. <u>Import and Export Controls</u>. This Agreement involves products and/or technical data that may be controlled under the U.S. Import and/or Export Administration Regulations and related laws, rules and regulations, and may be subject to the approval of the U.S. Department of Commerce prior to import or export. Any import or export, directly or indirectly, in contravention of the U.S. Import and/or Export Administration Regulations is prohibited. Carrier shall be the broker of record for all services provided to TAIS that relate to the import and/or export of TAIS' cargo. Carrier agrees to fully comply with and be responsible for understanding all import and export laws, regulations and rules now in effect or that may be issued from time to time by the Office of Export Administration of the U.S. Department of Commerce or any other governmental authority that has jurisdiction relating to import and export laws for the countries specifically listed in this Agreement and all countries in which Carrier does or intends to do business. Additionally, Carrier shall be responsible for compliance with all laws, rules, regulations and procedures relating in any way to the services provided to TAIS.

8. <u>Assignment</u>. This Agreement cannot be assigned by either party without the prior written consent of the other, which consent shall not be unreasonably withheld.

9. <u>Compliance with Laws and Regulations</u>. Carrier, at its cost and expense, shall provide motor and/or air vehicles, equipment and insurance thereon for use in the services to be performed hereunder, and all such vehicles, equipment and insurance shall be in compliance with all applicable laws and regulations. Carrier shall maintain the vehicles and equipment in good and working condition, both as to operation and appearance. Carrier, at its cost and expense, shall employ in operation of such vehicles and equipment qualified personnel, and shall procure and maintain such insurance, licenses and permits as required by applicable law with respect to transportation services.

10. <u>Independent Contractor</u>. In Carrier's performance of the services and other obligations under this Agreement, Carrier is at all times acting and performing as an independent contractor to TAIS. Carrier shall not represent that it is, nor shall it be deemed as, or be construed as TAIS' agent. Carrier shall have exclusive control and direction of the individuals operating motor vehicles or otherwise engaged in such services. Except as otherwise provided herein, TAIS shall not have or exercise any control or direction over the method, manner or means by which Carrier performs its obligations or renders or performs the services provided for in this Agreement. Carrier assumes full responsibility for the payment of local, state and federal payroll taxes and contributions or taxes for, among other things, unemployment insurance, pensions, welfare benefits, workers' compensation, social security and other related protection with the respect to the individuals engaged in the performance of the services that are the subject of this Agreement. Additionally, subject to the limitations of liability contained in Section 12, Carrier shall be legally responsible for the negligent acts or omissions or willful misconduct of its agents, employees or independent contractors in the performance of this Agreement, and Carrier shall defend, indemnify and hold TAIS harmless from and against all third party claims, lawsuits or liabilities (including attorneys' fees and costs) arising therefrom, excluding third party claims based on loss, damage or delay of any shipment. Carrier shall insure that any of its agents, subcontractors or independent contractors agree to be liable to TAIS to the same extent as Carrier under this Agreement. Under no circumstances shall Carrier have the right to act or make any commitment of any kind to any third party on behalf of TAIS, except on the express prior authorization of an authorized representative of TAIS.

11. <u>Insurance and Investigation</u>. Carrier shall place into effect and carry during the term of the Agreement cargo liability insurance, from an insurance carrier rated at least "A" by *Best's Rating Guide*, per shipment without deductible, and comprehensive general liability insurance of at least $1 million per occurrence and $2 general aggregate limit. Written evidence of such insurance shall be provided to TAIS within thirty (30) days from the Effective Date of this Agreement. Carrier's insurance policies shall not exclude coverage for infidelity, fraud, dishonesty or criminal acts of Carrier's employees, agents, officers or directors. In the event of any lapse in such coverage, Carrier shall immediately notify TAIS, and failure to do so shall constitute grounds for immediate cancellation or rescission of this Agreement by TAIS without further notice. In the event of a loss or damage to shipments made on behalf of TAIS, or inbound to Shippers facilities, Carrier shall immediately notify the TAIS' Logistics Department in writing by facsimile within twenty-four (24) hours thereof. Carrier shall also provide TAIS with

4

daily notice of any deliveries outstanding for seventy-two (72) hours or longer. In addition, Carrier shall conduct an internal investigation as soon as the Carrier knows of any loss or damage to TAIS' cargo. Carrier must give TAIS written details of the investigation including police reports, when applicable, within thirty (30) days of the loss or damage.

12.  Carrier Liability. Carrier assumes the liability of a common carrier consistent with the Carmack Amendment for shortage, loss, damage or delay of cargo from receipt until actual delivery of the cargo to consignee.

12.1  Shortage and loss include, but are not limited to, the mysterious disappearance or loss caused by negligence of the Carrier, its officers, employees, agents, subcontractors, or independent contractors. The amount of the Carrier's liability shall be full release value up to $50,000 for each U.S. domestic bill of lading, and $30,000 for each international bill of lading originating in the United States. For International shipments originating from overseas locations and falling under the Overseas Direct Shipping Program (Appendix B) or the Non-Direct Shipping Program (Appendix C) amount of the Carrier's liability shall be full release value up to $50,000.00 per Commercial Invoice from factory (OEM) to the destination gateway. For Direct Shipping Program DNs (Sales Orders), amount of the Carrier's liability shall be full release value up to $50,000.00 per DN once freight is transferred to Carrier's domestic system. It shall be Carrier's responsibility to identify shortages and/or damages which occurred during the international segment of travel, prior to transfer into the Carrier's domestic network. If no damage or loss is noted prior to transfer into Carrier's domestic system, damages/losses will be assumed to have occurred in the domestic network. Shortages and/or damages must be clearly documented and signed for at transfer so as to indicate whether the loss/damage occurred in the international or domestic system. Furthermore, to the extent shortage and/or loss exceed the above release values, liability will be calculated per the following terms: a) with respect to U.S. domestic transportation, $5.00 per pound; b) with respect to international shipments, liability per shipment shall be calculated in accordance with the applicable international carriage of goods convention. In the event that no such international convention is applicable liability per international shipment shall be calculated at $5.00 per pound. In no event shall the liability of Carrier or its officers, employees, agents, subcontractors or independent contractors for shortage or loss exceed One Million Dollars ($1,000,000) per shipment. TAIS will provide notice to Carrier of concealed damaged and/or concealed lost freight within seven (7) calendar days of Carrier's delivery of the cargo. Full release value coverage will apply to concealed damage and/or loss. No deductible or other limitation as published in any Motor Freight publication or tariff shall apply to tendered shipments. Subject to the limitations above, in the event of lost cargo, Carrier shall reimburse TAIS for its "Standard Cost."

12.2  If Carrier discovers a partial loss of cargo prior to delivery, Carrier must not deliver the shipment short, but shall contact the TAIS' Transportation Office for instructions. Carrier will mark TAIS' bill mask with the annotation, "Do Not Deliver Short. Contact Originating Terminal For Instructions."

12.3 In the event a shipment is discovered to have a partial loss, and the Carrier is directed to return the remaining portion of the shipment to Irvine, CA, the transportation will be on a "free astray" basis (defined as, transported at no cost to TAIS) for inspection. In the event Carrier discovers any portion of TAIS' cargo has been broken into, and either all or parts of the contents are missing, Carrier shall transport such product on a "free astray" basis to TAIS in Irvine, CA for inspection. Carrier shall have no right to the salvage value of any remaining contents regardless of the outcome of the claim.

12.4 In the event Carrier delivers cargo that has been damaged, but no physical damage (cosmetic or otherwise) to the product(s) is/are evident, Carrier shall contact TAIS' Transportation Office for instructions. When such cargo must be returned to TAIS' facility, transport will be "free astray" for inspection and/or re-boxing.

12.5 In the event of cargo damage or partial loss, the Carrier shall take due diligence to record all serial numbers (serialized product) and/or model numbers (non-serialized product) prior to delivering the remainder of the cargo either to the consignee or TAIS, according to TAIS' instructions. If TAIS instructs Carrier to return cargo to TAIS in Irvine, CA, then Carrier shall have fourteen (14) calendar days to do so, after which time Carrier shall be assessed a charge of $10.00 per day per carton. If such cargo is outstanding more than 90 days, the cargo will be considered lost and Carrier must pay TAIS the standard cost of the unit(s) in question. Carrier shall pay such claims within thirty (30) days of the 91st day (i.e., 121 days after TAIS instructs the Carrier), or the penalty provisions of Section 12.8 will apply.

12.6 In the event TAIS in its sole discretion determines damaged cargo *is **not*** "beyond repair," Carrier's liability will be $30.00 per pound or the cost of repair (Material and Labor), whichever is less. In the event TAIS in its sole discretion determines the damaged cargo *is* "beyond repair," Carrier shall be liable for the full release value, not to exceed $50,000 per Bill of Lading for U.S. domestic shipments and $30,000 for international shipments. Furthermore, to the extent cargo damage is "beyond repair" and exceeds $50,000 for a domestic bill of lading or $30,000 for an international bill of lading, liability for the loss above $50,000 or $30,000, respectively, will be calculated per the following terms: a) with respect to U.S. domestic transportation, $5.00 per pound; b) with respect to international shipments, liability per shipment shall be calculated in accordance with the applicable international carriage of goods convention. In the event that no such international convention is applicable liability per international shipment shall be calculated at $5.00 per pound. In no event shall the liability of Carrier or its officers, employees, agents, subcontractors or independent contractors for damages cargo "beyond repair" exceed One Million Dollars ($1,000,000) per shipment. TAIS shall take immediate possession of all damaged cargo. Carrier shall have no right to the salvage value of damaged cargo regardless of the future outcome of the claim, and Carrier shall not seek in any way to obtain the damaged cargo unless TAIS agrees otherwise in writing. Carrier must obtain and retain proof of return (signed by a TAIS employee) for all damaged cargo.

6

12.7   Carrier will accept as documentation of any loss a computer-generated Claim form, consistent in content with the requirements of National Motor Freight Classification. TAIS may send such documentation to Carrier via e-mail or facsimile. The only additional documentation TAIS will provide is a computer-generated "Item Master Inquiry," which lists the "Standard Cost" referenced in Paragraph 12.1.

12.8   Carrier shall make commercially reasonable efforts to pay claims within thirty (30) days of TAIS' filing date. Notwithstanding the foregoing, Carrier shall pay <u>all undisputed</u> TAIS claims within sixty (60) days of TAIS' filing date. All claims outstanding for more than 60 days without TAIS' written authorization shall be subject to a penalty of 5% of the claim amount. TAIS shall assess the aforementioned penalty for each ten (10) day period over 60 days from the filing date. The "filing date" for purposes of this Section shall be defined as the date Carrier receives, in writing, a complete claim package from TAIS.

12.9   Neither this Agreement, nor any recovery from the Carrier, shall be deemed to affect, preclude or preempt TAIS from receiving any additional recovery in tort or otherwise as against any entity other than the Carrier, its officers, employees, and directors.

12.10   TAIS shall have twelve (12) months from the date of shipment to file cargo claims for either loss or damage, or both. This Section 12.10 does not apply to concealed loss or concealed damage, which is governed by Section 12.1, above.

12.11   Notwithstanding anything to the contrary herein, EXCEPT FOR ITS INDEMNITY OBLIGATIONS AND BREACH OF SECTION 15, IN NO EVENT SHALL EAGLE BE LIABLE FOR INCIDENTAL, CONSEQUENTIAL (INCLUDING LOST PROFITS), SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES IN CONNECTION WITH THE GOODS OR THE SERVICES RENDERED HEREUNDER EVEN IF NOTICE WAS GIVEN OF THE POSSIBILITY OF SUCH DAMAGES AND EVEN IF SUCH DAMAGES WERE REASONABLY FORESEEABLE. This paragraph shall survive termination of this Agreement.

13.   <u>Force Majeure</u>.   Either party shall be excused from any delay or failure in performance hereunder caused by reason of any occurrence or contingency beyond its reasonable control, including but not limited to, acts of God, earthquake, labor disputes and strikes, riots, war, or governmental requirements provided that the party experiencing such delay promptly provides written notice to the other party of the delay. The obligations and rights of the party so excused shall be extended on a day-to-day basis for the period of time equal to that of the underlying cause of the delay.

14.   <u>Notice</u>.   Any and all notices required or permitted to be given under this Agreement shall be in writing and shall be delivered to the party entitled to receive the same by hand, by facsimile, by private overnight delivery services or by U.S. prepaid mail, return receipt requested, addressed to the following:

7

|  |  |
|---|---|
| TAIS: | Toshiba America Information Systems, Inc.<br>9740 Irvine Boulevard<br>Irvine, CA 92618<br>Attn: Transportation Manager<br>Fax: (949) 587-6081 |

For notices relating to modification, termination or renewal of this Agreement:

>Toshiba America Information Systems, Inc.
>9740 Irvine Boulevard
>Irvine, CA 92618
>Attn: Vice President, General Counsel
>Fax: (949) 587-6235

|  |  |
|---|---|
| Carrier: | EGL Eagle Global Logistics LP<br>15350 Vickery Drive<br>Houston, Texas 77032<br>Attn:<br>Fax: |

or to such other address as either party shall from time to time advise the other party. Any notice given under this Agreement shall be effective, if by personal delivery, on the date of such delivery, if by facsimile, on the day sent, if by overnight delivery service, one day after submission to such service and if sent by mail, three (3) days after return receipt accepted at TAIS' address.

15. <u>Confidential Information.</u>  Each Party acknowledges that it may acquire information and materials about the other Party, including but not limited to its technical information, experimental work, pricing, customers and suppliers, and that all such knowledge, information and materials acquired or developed are and shall be trade secret and confidential and proprietary information (hereinafter referred to as "Confidential Information"). Each Party shall hold the other Party's Confidential Information in strict confidence, not to disclose the Confidential Information to any third party or to use the Confidential Information in any way, commercially or otherwise, and not to allow any unauthorized person access to the Confidential Information, either before or after expiration or termination of this Agreement, without the prior written consent of the Party disclosing the Confidential Information (the "Disclosing Party"). Further, each Party shall take all actions reasonably necessary and satisfactory to the other Party to protect the confidentiality of that other Party's Confidential Information including, without limitation, implementing and enforcing operating procedures to minimize the possibility of unauthorized use or copying of the Confidential Information and limiting disclosure of Confidential Information only to the Party's agents, employees, or independent contractors with a business need to know who (i) have been approved in advance by the

other Party, (ii) have been advised of the confidential nature thereof, and (iii) are under an express written obligation to maintain such confidentiality.

Confidential Information does not include information that: (a) is now, or hereafter becomes, through no act or failure to act on the part of the Party receiving the Confidential Information (the "Receiving Party"), generally known or available to the public; (b) was known by Receiving Party prior to the effective date of this Agreement; (c) was acquired by Receiving Party before receiving such information from the Disclosing Party and without restriction as to use or disclosure; (d) is hereafter rightfully furnished to Receiving Party by a third party; (e) has been independently developed by the Receiving Party; (f) is required to be disclosed pursuant to any law or regulation; or (g) is disclosed with the prior written consent of Disclosing Party. Upon termination or expiration of this Agreement, the Receiving Party shall deliver to the Disclosing Party all Confidential Information and all copies thereof, which shall remain the property of the Disclosing Party.

16.  Governing Law and Jurisdiction. This Agreement shall be governed by and interpreted in accordance with the laws of the State of California, excluding California's conflict of law provisions that direct the application of another jurisdiction's laws. The parties expressly consent to the jurisdiction of the federal and state courts located in Orange County, California in the event of any litigation relating to this Agreement.

17.  Arbitration. All questions or controversies arising out of or related to this Agreement, other than cargo claims, shall be submitted to binding arbitration in Irvine, California according to the then-existing rules of the American Arbitration Association, except to the extent those rules conflict with the terms of this Section.

17.1  Notice. The party desiring to initiate arbitration must do so by sending written notice of an intention to arbitrate by registered or certified mail to the other party(ies) and to AAA. The notice must contain a description of the dispute, the amount of money involved, and the remedies sought.

17.2  Arbitrator. The parties shall attempt to agree on a retired judge or experienced lawyer from the AAA panel to act as the arbitrator hereunder. If the parties are unable to agree, AAA shall provide a list of three (3) available and impartial retired judges/lawyers to each party and each party may strike one (1) name from the list. The remaining judge/lawyer shall serve as the arbitrator. No one who has ever had any business, financial, family or other special relationship with any party to this Agreement shall serve as an arbitrator, unless the related party informs the other party(ies) of the relationship and the other party(ies) consent(s) in writing to the use of that arbitrator.

17.3  Discovery. The parties shall be entitled to conduct discovery, take depositions, and require the production of documents that would be discoverable under California law. All discovery disputes shall be decided in the sole discretion of the arbitrator.

17.4 Hearing. The parties have the right to representation by legal counsel throughout the arbitration proceedings. The presentation and admissibility of evidence at the arbitration hearing shall be governed by the California Evidence Code. Within reasonable limitations, both sides at the hearing may call and examine witnesses for relevant testimony, introduce relevant exhibits or other documents, cross-examine or impeach witnesses who shall have testified orally on any matter relevant to the issues, and otherwise rebut evidence, as long as these rights are exercised in an efficient and expeditious manner in the sole discretion of the arbitrator. Oral evidence given at the arbitration hearing shall be given under oath.

17.5 Decision. The arbitrator's decision shall be based on the evidence introduced at the hearing, including all logical and reasonable inferences therefrom. The prevailing party shall recover reasonable attorneys' fees and reasonable costs incurred in connection with the arbitration proceeding, in addition to any relief to which it may be entitled by law. The award must be made in writing and signed by the arbitrator. It shall contain a concise statement of the reasons in support of the decision. The award must be mailed promptly to the parties, but no later than thirty (30) days from the closing of the hearing. The award may be judicially enforced (confirmed, corrected or vacated) pursuant to California Code of Civil Procedure Section 1285 et. seq. The award is final and binding and there shall be no direct appeal from the award on the grounds of error in the application of the law.

18. Modification. This Agreement and the attached Appendices may not be modified or amended except in writing signed by authorized representatives of both parties.

19. Waiver. Failure of either party to require strict performance by the other party of any provision of this Agreement shall not affect the first party's right to require strict performance thereafter. Waiver by either party of a breach of any provision of this Agreement shall not waive either the provision itself or any subsequent breach.

20. Severability. If any provision of this Agreement is for any reason found by a court of competent jurisdiction to be unenforceable, the remainder of this Agreement shall continue in full force and effect.

21. Headings. The headings and titles of the Sections of the Agreement are inserted for convenience only, have no force or effect and shall not affect the construction or interpretation of any provision.

22. Entire Agreement. This Agreement and the attached Appendices constitute the full and complete understanding and agreement of the parties hereof and supersedes and renders without any force or effect all prior written or oral understandings and agreements. However, the parties hereto may from time to time amend, modify, supplement or add to the services to be performed by a writing that specifically mentions this Section. Each and every term in every paragraph of this Agreement is a material term, which cannot be deviated from, as to which any failure in compliance shall entitle TAIS to cancel or rescind this Agreement as well as pursue all available remedies. To the extent that the text of this Agreement is inconsistent with any Appendix, Exhibit or Bill of Lading, the text of this Agreement shall prevail. TAIS' preparation of a bill of lading shall be deemed a mere receipt, not a contract.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the day and year first above written.

| TOSHIBA AMERICA INFORMATION SYSTEMS, INC. | EGL EAGLE GLOBAL LOGISTICS, LP by its general partner, EGL Management LLC |
|---|---|
| By: *(signature)* <br> Name: Gary Weaver <br> Title: VP Operations <br> Date: 2/12/04 | By: *(signature)* <br> Name: Elijio V. Serrano <br> Title: CFO <br> Date: 2-25-04 |

Tax Identification No.: 76-0094895